| | |
|---|---|
| EDWARD PHILIP SMITH, III | : |
| | : |
| v. | :   CIV. NO. 3:05CV960 (HBF) |
| | : |
| CONNECTICUT DEPARTMENT OF | : |
| CORRECTIONS, ET AL | : |
| | : |
| | : |
| | : |

BENCH RULING

Edward Philip Smith, III, a state prisoner, brings this action against the Connecticut Department of Corrections ("DOC"), the University of Connecticut Health Center, Correctional Managed Health Care and Dr. Edward Blanchette, alleging violation of his civil rights under the Eighth Amendment to the United States Constitution.[1] Plaintiff seeks compensatory damages, punitive damages, equitable relief, and declaratory judgment.

A bench trial was held on July 16, 17. and 18, 2007. Edward Philip Smith, Kitty Dudley, Dr. Joann Tuttle, Dr. Jeffrey Berkley, Dr. Albert Toro and Dr. Edward Blanchette testified at trial. Testimony and evidence adduced at the hearing are summarized below as necessary to explain the Court's findings and conclusions.

---

[1]Pursuant to 42 U.S.C. §1983, the Second Amended Complaint alleges a violation of plaintiff's Eighth Amendment rights by the defendants' deliberate indifference to serious medical needs. Defendants are Connecticut Department of Corrections (Count One), UCONN Health Center, Correctional Managed Care (Count Two), and Dr. Edward Blanchette and DOC Commissioner Theresa Lantz (Count Three). Defendant Theresa Lantz's Motion to Dismiss plaintiff's claims against her in her individual capacity was granted on March 1, 2007. [Doc. #81].

<u>FINDINGS OF FACT</u>

Based on the credible testimony, the exhibits, and the entire record compiled during the trial, including testimony by video of plaintiff's expert, Dr. Jeffrey Berkley, the Court finds established the following facts which are relevant to this ruling.[2]

1.  Plaintiff, Edward Phillip Smith, III, a thirty-five (35) year old male, is an inmate at MacDougall-Walker Correctional Institution ("MacDougall"), a facility run by the Connecticut Department of Corrections.

2.  Plaintiff has been incarcerated since February 14, 1992. He is serving a thirty-year (30) sentence. [Stip. ¶1]. Smith testified that his current release date is August 9, 2013.

3.  On May 19, 1992, plaintiff was seen and evaluated by medical staff after an altercation with another inmate, in which he sustained injuries to his face. [Ex. 502E].

4.  On May 20, 1992, treatment records note that plaintiff refused his meds, stating he was unable to move his jaw or open his mouth due to pain in his left TMJ area. Plaintiff refused to eat. [Ex. 502E].

---

[2]The parties stipulated to certain facts, which are listed in the Plaintiff's Trial Memorandum [Doc. #71], and cited in this opinion as "Stip." Plaintiff filed a Supplemental Trial Memorandum on August 10, 2007. [Doc. #96].

5.  Plaintiff claims he sustained a jaw injury when correctional staff used force against him on or about December 20, 1993. [Stip. ¶2].

6.  On April 6, 1994, plaintiff filed a lawsuit against the New Haven Department of Corrections, et al, 3:94CV571(TPS). After counsel was appointed for plaintiff, the parties entered into a stipulated settlement on June 19, 1999. [Stip. ¶3].

7.  On June 23, 1999, Judge Smith dismissed the case with prejudice. [3:94CV571 (TPS)].

8.  Under the terms of the settlement agreement, plaintiff was paid $1,000 and it was agreed that the State of Connecticut Department of Corrections ("DOC") would insure that plaintiff was examined by a board certified neurologist and oral surgeon chosen by the DOC, but who did not work for the DOC, for his complaints of headache and jaw pain.  The DOC also agreed that plaintiff would receive all testing, further treatment and further consultations recommended by said neurologist and oral surgeon.  The Stipulated Settlement Agreement also provided:

> 5. The parties understand and agree that the payment of the aforesaid sum is not intended to constitute, nor shall it be regarded as, an admission of liability on the part of the State of Connecticut, the Office of the Attorney General, the Department of Correction, or any of their present or former officers, agents or employees, including the named defendants.  Rather, this stipulation between the parties constitutes a compromise

settlement of the matters stated in this
claim for the sole purpose of avoiding
further expense and inconvenience to both
parties in pursuing or defending this matter
as might otherwise be required.
6. The parties expressly acknowledge that
this Stipulated Settlement is intended to,
and shall, constitute full and final
settlement of all claims and/or rights of
action which have arisen, or may in the
future arise, out of any of the circumstances
which are subject of this lawsuit including
but not limited to, common law claims of
negligence and intentional infliction of
emotional distress, and such claims as may be
cognizable under Title 42 U.S.C. §1983 for
alleged violations of the plaintiff's civil
rights.
7. The parties agree that the terms and
conditions of this Stipulated Settlement
shall be incorporated into the motion for
order of dismissal referred to in paragraph 1
above, and that the United States District
Court for the District of Connecticut may
retain jurisdiction over this matter for the
purpose of ensuring that all of the terms and
conditions of this agreement are carried out
as set forth herein.

[Stip. ¶5].

9.    A soft diet is typically prescribed for those suffering from

      TMJ pain to alleviate any stress to the joint.  It is

      usually difficult and/or painful for someone suffering from

      TMJ to eat tough, hard or chewy food; hence the reason for

      the prescribed soft diet. [Stip. ¶6].

10.   In accordance with the 1999 Stipulated Settlement Agreement,

      plaintiff was seen by a neurologist on September 3, 1999.

      The neurologist noted that plaintiff had normal cranial

      nerve motor coordination, reflex and sensory examinations.

      The neurologist further noted that the MRI of plaintiff's

      brain stem was completely normal and showed no evidence of

traumatic changes, tumor, vascular disease or any other
neurologic impairment. [Stip. ¶ 7].

11. The neurologist opined that plaintiff should continue taking
proporanlol, or Inderal.  In addition, the neurologist
stated that he should continue taking Naproxen, but watch
for complaints of G.I. distress. Finally, he noted that
Ergotamine Tartrate or Cafegot was working for abortive
therapy. [Stip. ¶ 8].

1999 Left Arthrocentesis

12. On or about October 19, 1999, Smith underwent Left
Arthrocentesis under intravenous sedation in Iowa. [Stip.
¶9].

13. The space in Smith's left Temporo Mandibular Joint ("TMJ"),
the jaw joint, was punctured with a needle in order to
aspirate (withdraw) accumulated fluid from the joint and to
inject a steroid agent, betamethasone, into the joint to
relieve inflammation and pain. [Stip. ¶10].

14. Smith stated this procedure alleviated his discomfort until
September 2002, when impacted wisdom teeth, Nos. 1 and 16,
were extracted. [Stip. ¶11].

15. According to the Iowa Department of Corrections Health
Services record, Smith was seen by Dr. James Morgan on
December 17, 2002, at which time he noted that Smith had
pain in his left TMJ upon opening. [Stip. ¶12].

16. For pain, Dr. Morgan prescribed Motrin 800 mg to be taken
three times a day and Flexeril 10 mg.  Flexeril is a muscle

relaxant used to treat muscle spasms. [Stip. ¶13].

17. Dr. Morgan also indicated that Arthrocentesis should be scheduled for June 2003. [Stip. ¶14].

18. Thereafter, Smith was prescribed a soft diet and bedtime snacks. [Stip. ¶15].

June 2003

19. On June 8, 2003, Smith was returned to the Connecticut DOC from Iowa. [Stip. ¶16].

20. His June 30, 2003, treatment records state, "Transfer from Iowa, interstate compact on 6/8/03. No file found. Denies MH issues. MH hx-antipsychotic drugs-[zero] meds since 1994. Hx jaw problems, had arthrocentesis. States jaw joint is "out of place."  Has seen dental @ [handwriting illegible]. Denies other medical hx . . .  Will make sure he has dental appt." [Ex. 1A].

21. On July 3, 2003, plaintiff was seen by Dr. DuPont, an OMFS, who works at the prison as the Lead Dentist. Dr. DuPont took a history from plaintiff and referred him to the Utilization Review Committee for a referral to UCONN Health Center Oral Surgery Department. [Stip. ¶17].

22. Orders for Motrin and Flexeril were renewed on July 19 and September 12, 2003. [Ex. 1A].

23. Diagnostic Radiologic Reports from October 24 and November 25, 2003, indicated no acute fractures, no abnormality. [Ex. 500A, 500B].

24. On November 24, 2003, Dr. Albert Toro, Dental Services
    Coordinator for UCONN Correctional Managed Health Care,
    reviewed plaintiff's case.  Dr. Toro ordered new x-rays and
    asked that the new x-rays be reviewed by radiology.  On
    December 23, 2003, Dr. Toro spoke with the facility and
    recommended that Smith be referred to the dentist to order a
    referral for an MRI. [Stip. ¶18].

2004

25. On February 5, 2004, an MRI was taken of Smith's TMJ to
    evaluate TMJ area pain.  The MRI report stated that Smith
    had degenerative joint disease, moderate on the left side
    and moderate to severe on the right side of his jaw.
    [Stip. ¶19; Ex. 504A].

26. On March 29, 2004, Smith was seen at UCONN by Dr. Stasulis,
    an Oral Maxillary Facial Surgeon ("OMFS"), at UCONN, who
    opined that Smith had degenerative joint disease of the TMJ
    and that no surgery was indicated.  Dr. Stasulis further
    recommended conservative therapy monitored by the facility
    dentist, soft diet, and continued use of the splint for 24
    hours, physical therapy, and prioxicam, a non-steroidal
    anti-inflammatory medication used to treat inflammation and
    pain.  Dr. Stasulis indicated that Smith should follow up in
    a month at which time he might consider Arthrocentesis if
    there was no change in Smith's condition.  [Stip. ¶ 20].

27. On May 17, 2004, plaintiff was seen at UCONN by Dr.
    Butterfield, an OMFS,  who recommended that plaintiff

undergo left TMJ Arthrocentesis under intravenous sedation. On July 20, 2004, Smith was seen by Dr. Fleischman, an oral maxillary surgeon, who attempted to perform left TMJ Arthrocentesis. Dr. Fleischman was unable to perform the surgery because Smith's soft tissue became distorted by the local anesthesia. On August 12, 2004, Smith was seen by OMFS staff at UCONN, who recommended left Arthrocentesis of his left TMJ and continued his current medication regime of Tylenol #3 three times a day, Flexeril 10 mg for twice a day and Naprosyn 50 mg twice a day. [Stip. ¶21, Ex. 504B].

28. Smith was seen on August 10, 2004, per an "emergency request," "I'm in so much pain I don't know what to do. I need help." Plaintiff was given pain medication. The treatment notes further state, "I/M has a jaw injury for which he receives pain medication. Has not yet received it. Sent to RHU [Restricted Housing Unit] today. Having difficulty with the noise. Denies intent to self-harm. Clearly in physical pain. Medical called to RHU-I/M given pain meds. Will make toilet paper ear plugs to cope with noise." [Ex. 3A].

29. Smith was seen by UCONN OMFS on August 12, 2004, "per Dr. Blanchette." [Ex. 3A].

30. On August 11, 2004, plaintiff moved to reopen the settlement in Smith v. New Haven Corrections, alleging that defendants had not complied with the terms of the agreement. Denying this motion on December 6, 2004, Judge Smith noted that

plaintiff received his second surgery.  No appeal was taken from the court's order. [Stip. ¶22; 3:94CV571 (TPS) Doc. #75].

31. The August 16, 2004, treatment notes state, "I did write that I don't feel safe here and I would hurt myself before I let others hurt me."  "I/M seen re: grievance he wrote with statement he might as well take his own life if things didn't get better.  In conversation with I/M his biggest concern is his pain medicine and the times he gets it as he has pain in between receiving his meds. I/M has prn however due to his suicide threat I/M should keep his pain meds on person.  I/M calm, tearful at times, negative, . . . [handwriting illegible] . . . speech and eye contact good." . . [Ex. 3A].

2004 Left Arthrocentesis

32. On October 21, 2004, Smith underwent left TMJ Arthrocentesis without complications at UCONN by Dr. Mayers, an OMFS.  Dr. Mayers further prescribed a soft, non-chew diet, Tylenol/Motrin 600 mg. every six (6) hours for pain, as needed; Naprosyn 500 mg. twice a day and follow up in two (2) weeks.  Naprosyn is a non-steroidal anti-inflammatory drug ("NSAID"), used to relieve inflamation, swelling, stiffness, and joint pain. [Stip. ¶24; Ex. 504C].

33. The October 22, 2004, treatment notes indicate that Smith was seen for a follow-up post-surgical appointment. "[Inmate] states 'I don't think the procedure worked, I

9

still can't open my mouth more than an inch and I'm still in pain . . . I'll be in a lot of pain if they take away my Tylenol #3." [Ex. 500R].

34. On October 25, 2004, Dr. McDonald, the facility dentist, saw Smith, who was complaining of pain and limited ability to open his mouth. [Stip. ¶25]. Dr. McDonald reported that Smith had a 10mm opening, no swelling or bruising, no lock or spasm. The doctor advised moist heat to left TMJ. "Explained need for time to recover from TMJ procedure." [Ex. 500G].

35. Smith was seen by the facility physician, Dr. Giarrantana, on October 26 and 28, 2004. Dr. Giarrantana continued Smith's prescriptions for Tylenol #3, Flexeril and Naprosyn. [Stip. ¶26; Ex. 500R].

36. On November 10, 2004, the facility physician, Dr. Pillai, continued Smith's prescriptions for Tylenol #3 three (3) times a day for seven (7) days and Flexeril ten (10) mg. twice a day for seven (7) days. [Stip. ¶27; Ex. 500R].

37. On November 16, 2004, Smith was seen by an OMFS resident, Dr. Hatzigiannis, under the supervision of Dr. Shafer, the head of the Oral Maxillary Facial Surgery Unit at UCONN. [Stip. ¶28]. Dr. Hatzigiannis recommended mouth opening exercises for 30 minutes daily for eight (8) weeks, a splint, a non-chewing diet and Naprosyn for eight (8) weeks. [Ex. 500D].

38. The November 17, 2004, treatment notes state that Smith

performed his therapy as instructed. [Ex. 1C].

39. On November 18, 2004, Dr. Giarratana ordered Naprosyn, 500 mg. twice a day for eight (8) weeks, and a non-chew diet, but stated that Smith's Tylenol #3 should not be renewed. [Stip. ¶29].

40. The November 18, 2004, treatment notes report that Smith states, "I need more pain meds." "Chart review by oral surgeon . . . determines that Tylenol #3 will not be renewed and to follow game plan by UCONN. . . I/M very upset with above and told this writer that his people would be in touch." [Ex. IC]. A second treatment note from November 18 states, "seen in bldg [complaining of] pain-states UCONN said he could still have Tyl #3 I/M told about . . . tongue depressors for therapy-states- I'm in too much pain to do it." [Ex. 1C]. A third entry on November 18 states, "Numerous calls from Building #1 from Lt's office re: I/M and pain meds. "I need pain meds, I already took my 2 Naprosyn today. I haven't eaten my mouth is swollen . . . ." [Ex. 1C].

41. On November 19, 2004, Smith was seen by Dr. McDonald, the facility dentist, who noted that Smith had been seen by an OMFS on November 16, 2004, and he was taking Naprosyn 500 mg. twice a day and doing tongue blade therapy for eight (8) weeks to open his bite. Flexeril was prescribed. [Ex. 505B].

42. Treatment notes from November 23, 2004, state that Smith was asking to see a doctor. "I/M very upset [with] not seeing

11

physician-facility physician in agreement [with] (OMFS
surgeon) as far as TX plan, soft diet, oral exercises,
Naprosyn for discomfort, so therefore states no visit is
needed. I/M irate [with] grievances (medical) and contacting
Ann Lynch (Ass't Attorney General) re: pain management. Case
discussed at length [with] Dr. Blanchette (DOC) re:
complaints of continued pain, and I/M states no tx.
Discussed case at length and new tx plan until Dr.
Giarratana reviews case." [Pl. 1D].

43. Treatment notes from November 24, 2004, state, "I/M in unit
for tongue blade exercises. I/M used the blades for close to
15 min. Not the ordered 30 min. instructed on 11/16/04. I/M
was again advised of the 30 min time frame. I/M states, 'I
was told 15 min, besides I don't think I could do 30 min. I
am in too much pain.' I/M then took his Tylenol #3 and left
unit. [Ex. ID].

44. Smith was a "no show" for scheduled mouth exercises on
November 29, 2004. [Ex. 1D].

45. On December 1, 2004, Dr. McDonald noted that Smith had made
progress with this tongue blade therapy and was able to open
his mouth approximately 13 mm and move his jaw from side to
side without pain. [Stip. ¶30; Ex. 505B]. "I/M wants more
and different pain meds. I told him that decision is up to
UCONN O.S. and CMHC ["Correctional Managed Health Care"]
M.D."[Ex. 505B].

46. Treatment notes from December 2, 2004, state, "discussed

problem with Dr. Blanchette . . . inmate continues [with] pain. Dr. B will contact UCONN oral surgeon to discuss on going issue. In the meantime he ordered Tylenol #3 t.i.d. for 2 weeks." [Ex. 1E].

47. Smith was a "no show" for mouth opening exercises on December 15, 2004. [Ex. 1E].

48. Follow-up treatment notes from Dr. McDonald, DMD, dated December 16, 2004, state in part, "I/M frustrated w/tongue blade tx painful & not progressing." [Ex. 505B].

49. Treatment notes from December 16, 2004, state, "Tylenol #3 t.i.d. expired today [at] 12:30 p.m. Called Dr. Blanchette for possible renewal-Dr. Blanchette did not renew medication." [Ex. 1E].

50. On December 16, 2004, Dr. McDonald noted that Smith was talking comfortably but only opening his mouth 1 cm. Dr. McDonald noted that Mr. Smith had very limited side to side movements and his left TMJ was tender on palpation. Dr. McDonald also noted that Smith's teeth and gums looked less inflamed. Dr. McDonald renewed Smith's Flexeril for one month and noted that Smith was taking Feldene instead of Naprosyn. Feldene is another nonsteroidal anti-inflammatory drug, used to relieve inflammation, swelling, stiffness, and joint pain. [Stip. ¶31; Ex. 505B].

51. Treatment notes from December 17, 2004, record that Smith was writing a grievance because he needed his Tylenol #3. Smith reported that he was seen by the doctor the previous

day and Flexeril was ordered in error.  The "case was discussed with Pat W. [at] Osborne.  Pat W. called Dr. Blanchette re: pain management-medication denied. Dr. Blanchette called UCONN (OMF), Tylenol #3 "not warranted" (denied)-Tylenol #3 not renewed." [Ex. IF].

52.   A separate entry on December 17, 2004, states that Smith was called to medical. "No show for therapy and his meds. I/M in too much pain to do therapy. I/M reports 'you people are doing nothing for my pain.' I/M [refused] all his meds . . . [refused] to perform therapy as required by his current tx plan from OMF. I/M presented angry and unwilling to even try. Although was able to open mouth to voice opinions at the medical staff." [Ex. 1F].

53.   On December 27, 2004, Smith was seen at UCONN by Dr. Mayers an OMFS.  Dr. Mayers prescribed Tylenol #3 as needed every four (4) to six (6) hours for one (1) week.  Dr. Mayers also recommended a follow up in 2-4 weeks to determine if Smith should be scheduled for surgery if symptoms continued. [Stip. ¶32].

2005

54.   Treatment notes from January 11, 2005, state, "As per direction of CHNS I/M was informed that [emergency] grievance had been denied. At which time I/M became irate and began yelling at which time I/M was asked to leave unit." [Ex. 1G].

14

55. Smith was a "no show" for AM meds on January 12, 2005. [Ex. 1G].

56. On January 24, 2005, Smith was seen by Dr. Veeranki, an OMFS from UCONN, who reported that Smith was requesting pain medication. Dr. Veeranki noted that Arthrocentesis or surgery on Smith's left TMJ would not help. Dr. Veeranki recommended a chronic pain clinic consult, encouraged Smith to open his mouth, Flexeril 10 mg, twice a day, Naprosyn 250 mg, heat to left face, a soft diet and Tylenol #3 for break-through pain. [Stip. ¶33].

57. On February 25, 2005, Dr. Wright, the facility physician, ordered Flexeril 10 mg twice a day, Tylenol #3 twice a day as needed for pain, Naprosyn 250 mg three (3) times a day with meals. These orders were renewed on March 2, April 1, and May 2, 2005 for thirty (30) days. [Stip. ¶34].

58. On March 29, 2005, Smith's weight was recorded at 208 pounds. [Stip. ¶35]. Smith testified he is five (5) feet nine (9) inches tall.

59. On May 12, 2005, Dr. Pillai, the facility physician, noted that Smith received Arthrocentesis of his left TMJ on 10/21/04 and since then had received three (3) OMFS visits. Dr. Pillai also noted that the last MRI showed degenerative disk disease in both left and right TMJ but there was greater degeneration in the right TMJ. Dr. Pillai further noted that plaintiff did not have any complaints about his right TMJ. Dr. Pillai noted that the OMFS recommended jaw

exercises to open Smith's mouth, pain management, but no further surgical intervention. [Stip. ¶36]. "Plan: I did discuss[] with I/M the concerns on long term narcotic dependence issues especially in light of discrepancies noted between subjective and objective findings. I/m gets immediately angered yelling and [was] escorted out of office by officer." [Ex. 501D].

60. Plaintiff refused to perform mouth exercises on June 3, 7, 8, 2005. [Ex. 505A]. Smith was a "no show" for mouth exercises on May 19 and June 9, 2005. [Ex. 501D; 505A].

61. Plaintiff filed this federal action on June 14, 2005. [Stip. ¶23].

62. On August 1, 2005, an MRI was taken of Smith's TMJ joints. [Stip. ¶37; 500C]. Dr. Jagjivan noted,

> 1. Mild bilateral degenerative joint disease, manifested by flattening of the mandibular condylar heads. There are also bilateral bulbous articular eminences, more pronounced on the left side, which may contribute to this problem.
> 2. The articulate discs appear to have normal anatomy and position relative to the condylar head.
> 3. Reduced translational opening bilaterally. Given the unremarkable anatomy and appearances of the articular discs, this appears to be most likely due to myofascial pain dysfunction syndrome (MPD) and to be more pronounced on the left side.
> 4. No evidence of fluid effusion in or about either joint.

[Ex. 500C].

63. On August 11, 2005, treatment notes indicate that Smith had been refusing Flexeril for two (2) weeks. On September 12,

2005, Smith's weight was recorded at 207.2 pounds. Plaintiff's chart was reviewed and it was noted that his weight had been consistent since March 2005: 3/29/04-208 pounds, 8/2/05-203 pounds, 9/12/05-207 pounds. [Stip. ¶38].

64. Plaintiff was seen by UCONN OMF surgeon on August 29, 2005. Treatment records from that date state, "MRI [with] mild bilateral DJD. Exam with tender muscles, MID 10mm on my exam, but pt opened further prior to my examination (while speaking with guard). No OMFS intervention at this time." [Ex. 501B].

65. On September 15, 2005, Smith was seen by Dr. Shafer, Head of OFMS at UCONN, who noted that the August MRI showed mild degenerative joint disease. Dr. Shafer opined that no oral maxillary surgical intervention was required at that time. [Stip. ¶39].

66. On September 22, 2005, Smith was advised to continue using his splint or retainers and to adhere to a soft food diet to help his jaw muscles relax and rest. In addition, Smith was given written suggestions how to relax and rest his jaw muscles and jaw exercises. [Stip. ¶40].

67. On September 22, 2005, M. Castro, Medical Program Manager, CMHC wrote to Smith stating,

> Your letter of September 17, 2005, addressed to Dr. Buchanan, was received today and forwarded to my attention.
>
> It has come to my attention that you are able to speak without difficulty when you are not aware that you are being observed. Commissary records show that you have

purchased foods from the commissary - beef
jerky, beef salami, pepperoni, and potato
chips - that you would not be able to consume
if you had any significant jaw problems.
Your MRI and evaluation done by Dr. Shafer on
September 15, 2005 found no evidence of
internal temporal joint derangement or need
for surgery.

The medical evaluation of your complaint of
significant jaw impairment has concluded.
Based on these findings, your claims are
unfounded.

Any jaw discomfort you might be experiencing
could be related to tightness or overuse of
your jaw muscles.  This is considered a minor
and self-limiting problem.  The best
treatment for this is compliance with self-
care measures to prevent or decrease jaw
muscle tightness or overuse.  Continued use
of your splint and adherence to a soft diet
will help your jaw muscles relax and rest.
Information concerning helpful suggestions
and exercises is enclosed.

[Ex. 505C & D]. Smith was provided with a sheet entitled "Things

to Do to Relax and Rest Jaw Muscles" that contained, among other

things, information on deep breathing, progressive muscle

relaxation, guided imagery, meditation and jaw exercises. [Ex.

505D].

68.  On October 11, 2005, Smith was seen by Dr. McDonald,

facility dentist, who noted that on examination there were

no complaints of tooth pain or intra-oral problems except

bleeding gums.  Dr. McDonald also noted that Smith wore his

splint/night guard twenty-four (24) hours a day, removing it

only to brush his teeth.  Dr. McDonald noted that the

opening of Smith's mouth was limited but he was able to do

an examination.  Dr. McDonald advised Smith to remove his

guard periodically during the day and prescribed lateral and protrusive stretches. [Stip. ¶41].

69. On November 4, 2005, Smith was seen by medical complaining that he had lost six (6) pounds in two (2) days. Smith's weight was recorded at 206 pounds. It was noted that although Smith was stable, he would be examined by a physician. [Stip. ¶42].

70. On November 14, 2005, Dr. Thomas Hanny, the facility physician, reviewed Smith's liver function test and expressed concern about continued use of Flexeril 10 mg twice a day and Cafegot, ten (10) pills a week. Dr. Hanny decreased Smith's non-formulary drug Cafegot, which is used to treat and prevent migraine headaches, from a maximum of ten (10) per week to a maximum of six (6) per week. In addition, Dr. Hanny decreased Smith's Flexeril from ten (10) mg per morning to five (5) mg per morning for ninety (90) days. Dr. Hanny continued plaintiff's prescription for 10 mg of Flexeril at bedtime for ninety (90) days. A soft diet was prescribed through 2/28/06. [Stip. ¶¶43-44; Ex. 501E]. "As I explained to him why I have to reduce his medication (i.e. liver damage) he became angry and started shouting at me that I'm taking away his pain medications and I'm not replacing it with anything- 'hell [with] my liver I want to have my pain medications.'" [Ex. 501E].

71. On November 15, 2005, Dr. Cathy Levy, supervising psychologist, performed a mental health assessment of Smith

due to alleged threats to medical staff. [Ex, 501F]. Dr. Levy noted Smith's mental health history due to abuse and neglect during his childhood. The doctor recommended increasing Smith's mental health needs score to assist him if he chose to access mental health services. [Stip. ¶45; Ex. 501F]. The doctor noted a history of substance abuse "mild depression, personality disorder ASPD, borderline." "Currently seems to be quite invested in pain meds. He presents as a very frustrated, tormented male [with] an abusive background who appears very tenacious in his attempts to obtain relief from his perception of on going pain." [Ex. 501F].

72. Treatment notes from November 16 and 17, 2005, state Smith is refusing meals. [Ex. 501H].

73. A Medical Incident Report dated November 18, 2005, states that Smith is on a hunger strike, "[inmate] states, 'I'm drinking milk,' states preparation of food not suitable for his consumption." Smith was examined for all baseline functions. Diagnosis: "Alt in coping 'manipulative behavior.'" [Ex. 500S].

74. On November 22, 2005, treatment records state that plaintiff stated he could not eat what they were giving him. Plaintiff stated that he drank the milk and ate what he could. His weight was recorded at 194 pounds. [Stip. ¶46].

75. On November 25, 2005, it was noted that plaintiff was not eating selected foods. His weight was recorded at 188

pounds. In an addendum, it was noted that plaintiff ate two
(2) cereals with milk. [Stip. ¶47].

76. Plaintiff was housed at Carl Robinson Correctional
Institution from October 27, 2004 to November 29, 2005.
During that time period, plaintiff worked in the kitchen.
[Stip. ¶48].

77. Plaintiff's commissary lists from 2004 to 2005 show that
plaintiff ordered beef salami, beef jerky, and/or pepperoni
slices on 1/12/04, 1/20/04, 3/8/04, 4/12/04, 4/19/04,
4/19/04, 5/3/04, 5/17/04, 1/26/05, 2/15/05, 3/2/05, 4/6/05,
4/19/05, 5/3/05, 6/14/05, 6/28/05, 7/20/05, 7/27/05, and
8/9/05. Smith ordered Snickers and/or Baby Ruth candy bars
on 3/8/04 and 5/3/04. [Stip. ¶50; Ex. 305].

78. Plaintiff ordered a toothbrush on January 26, 27, February
23, March 8, 16, May 3, June 2, September 7, October 19, 26,
November 2, 30, 2004; January 11, February 15, April 19, May
17, July 27, December 27, 2005, September 5, 2006; March 12,
May 18, 2007. A dental floss stick was purchased on April
27, 2005. [Ex. 305].

79. Smith testified that he does not brush his teeth. He stated
he cleaned his mouth with swaps and used a perio rinse. He
stated, "I have not brushed my teeth."

80. Plaintiff ordered four (4) Payday candy bars on September
11, 2006. [Ex. 503 at 111].

81. In a letter to Patricia Ottolini dated August 31, 2005,
Smith admitted that many of the items purchased were not

21

"conducive to his condition."  However, Smith stated that he
purchased these items to use to barter with other inmates
for soups, as the commissary limits the number that he can
buy.  [Stip. ¶51].

82. Treatment notes from December 4, 2005, state that plaintiff
was seen by medical for treatment of his TMJ pain.  He was
encouraged "to persist [with] medical treatment as needed,
toward resolution of situations . . . ." [Ex. 3B].

83. Smith was seen on December 5, 2005, stating "he is hungry
because his dietary needs are not being addressed. I/M does
not show signs of mental illness. His requests ask that he
get some 'sound advice' on what he may do to better his
situation. Record reveals this I/M will soon see the M.D. to
discuss his concerns.  I/M needs encouragement to cope with
his frustrations around his pain management issues. Someday
he would like to get corrective surgery on his jaw to
improve his lifestyle . . . ." [Ex. 3B].

84. Dr. Blanchette's treatment notes dated December 14, 2005,
state,

> Chart reviewed-pt interviewed and examined.
> This pt states he is dissatisfied with his
> evaluation and treatment of his bilateral TMJ
> pain.  He states that he can barely open his
> mouth due to pain and is often unable to eat
> food normally even mechanically soft diet.
>
> During the course of our conversation (about
> 45 min) the pt's mandibular ROM [range of
> motion] significantly increased with time yet
> when I examined the patient directly, his ROM
> decreased to almost 0 (zero).  TMJ's
> themselves seemed stable-no clicks.

MRI from 8/1/2005 of both TMJ's showed only
mild DJD [degenerative joint disease] with
generally good mechanics.  I have reviewed
his commissary list for the past 6 months and
the items noted are very inconsistent with
the patient's report of what foods he must
have, what he can tolerate.

I have discussed this case at length with Dr.
Toro (CMHC dental director) and with UCHC OFM
physicians.  It is clear to me that he has
received the community standard of care for
his TMJ issues, that he is not a surgical
candidate by anyone's definition (including
OFM) and that his current clinical management
is very appropriate.

Conclusions:
-Pt's complaints are well out of proportion
to objective findings. He may be obsessed and
hysterical about this issue.
-NSAID's for defined periods of time OK
despite transaminase elevations - continue
Flexeril - no narcotics -mechanically soft
diet (routine)
-no further diagnostic studies indicated at
this time
-medical follow-up to include weights q
weekly to q monthly, LFT's q 203 months, Hep
B, Hep E serologies
-mental health follow-up.

[Stip. ¶49; Ex. 1H; 500T].

85.  On December 29, 2005, Smith was prescribed Naprosyn 500 mg

     every twelve (12) hours as needed for pain for ninety (90)

     days, Flexeril, 10 mg twice a day for ninety (90) days,

     Inderal, a non-habit forming beta blocker used to treat

     migraine, 20 mg twice a day for ninety (90) days.  [Stip.

     ¶52].

2006

86.  Smith was seen by  Psychiatric Social Worker Bill West on

     January 3, 8, 18 and 27, 2006. [Stip. ¶¶53 & 54, Ex. 501I,

501J].

87. Treatment notes from Bill West on January 3 state, "I/M persistent in his quest to get 'DOC; to 'fix' his jaw.  I/M firmly believes that he will be in the courts again, even if he gets parole eligibility. I/M able to articulate his needs. During session this I/M said he continues to endure constant jaw pain.  He is satisfied with his current medication regime but his ultimate goal is to prove 'fix' the jaw.  I/M needs to talk more about his anger and goals."  [Ex. 501I].

88. Treatment notes from Bill West on January 18, 2006, state

> I/M needs to be heard about his concerns over his health problems. He has studied a lot of "law," he said. He has family but he does not want them coming to visit at Corrigan CI ("behind glass?"). I/M frequently ponders on his quest to get his surgery to correct his jaw.  He wants to get therapy now to exercise the jaw but there are no opportunities. Attempt to encourage I/M to exercise 'carefully" on his own. His response again is ("they should just fix the problem via surgery, etc."). During visits this I/M is calm most of the time but when he thinks about his lack of accomplishment (which is to get reconstructive surgery and unable to do so) his anxiety level increases.  This I/M has filed for Federal status in hopes that he can find new avenues for restorative surgery of his jaw.

[Ex. 501J].

89. On January 31, 2006, Dr. Tuttle, a facility dentist, examined Smith and noted that his oral hygiene was very good, but a detailed examination of plaintiff's posterior teeth was not possible.  [Stip. ¶55].

24

90. On February 1, 2006, Smith's weight was recorded at 199.4 pounds. [Stip. ¶56].

91. On February 16, 2006, Dr. Buchanan approved a prescription of Cafergot for one (1) year. [Stip. ¶56].

92. On May 13, 2006, plaintiff was examined by Dr. Shafer, an OMFS at UCONN, who noted that plaintiff appeared complaining of acute pain and facial "muscle spasm" bilateral, with muscles tender on palpation. Panoramic x-rays showed no acute changes from 2004. Dr. Shafer recommended that plaintiff should continue with present pain medications including Flexeril and that his Flexeril should be increased as tolerated. Dr. Shafer noted that if plaintiff could not tolerate his diet, staff could consider pureed food. Dr. Shafer also recommended that plaintiff's splint be evaluated. [Stip. ¶57; Ex 504E].

93. On May 14, 2006, plaintiff was examined by Dr. Chouhan, who increased Smith's Flexeril to three (3) times a day and otherwise continued plaintiff's medication. [Stip. ¶59; 500U].

94. Smith refused meals on May 14, 15 and 16, 2006. [Ex. 500V].

95. On May 23, 2006, the kitchen supervisor met with plaintiff and went over his diet, item by item. Thereafter the kitchen supervisor issued a memorandum to all food services staff at Corrigan, addressing food preparation for Smith. [Stip. ¶59].

96. Smith was provided with a Periodex rinse on May 18 and

October 20, 2006. [Stip. ¶60].

97. On October 24, 2006, plaintiff was examined by Dr. Shafer, an OMFS at UCONN, who noted that plaintiff was able to open his mouth 6 mm with pain or 21 mm with assistance. Dr. Shafer opined that plaintiff should continue with his present care. [Stip. ¶60, Ex. 504F].

2007

98. Treatment notes from January 2, 2007, note that Smith reported, "My night guard is broke and is causing pain." Dr. Tuttle examined Smith and noted, "small acrylic sliver [] broke off of night guard-posterior portion still functional broken piece should not cause additional pain but i/m tearful. [Ex. 500H].

99. Treatment notes from January 2, 2007, from Dr. Tuttle state, "i/m seen in hospital section due to c/o pain. I/m has placed rolled paper in his mouth to keep it open-night guard still in . . . . I/m talks with the rolled paper in his mouth. I/m states he is in discomfort but speaks without any apparent . . . discomfort from prior visit, again i/m believes the broken piece from the anterior portion of the night guard is causing his additional pain; he has placed the paper to substitute for the missing acrylic sliver-given 4x4 gauze so he did not have to use paper; c/o [] from B block called at 9:30 for an update as Mr. Smith was requesting it; Mr. Smith was playing cards on the block at

that time with no apparent pain! C.o [] also reported that
on 12/29/06-2nd shift reported in the log book-Mr. Smith was
seen eating a concoction of rice, mashed potato chips and
meat; if pain persists Mr. Smith can be placed on a
mechanically soft or pureed diet; his weight can also be
monitored. URC submitted to Dr. Toro for a new night guard
to be fabricated at UCHC under sedation (cannot be made on
site as Mr. Smith cannot open his mouth far enough for a
tray to be inserted). [Ex. 500H].

100. Smith received an psychiatric evaluation from Dr. Telledrea
on January 3, 2007. The psychiatrist recommended anti-
depressants. [Ex. 501K].

101. Smith was transferred to MacDougall Infirmary on January 4,
2007, per Dr. Blanchette's request. [Ex. 500Q; 500II; 500W;
500Y]. The admission record states that Smith has "not
eaten in the past three days because of the jaw pain." [Ex.
500DD].

102. Treatment notes from January 5, 6, 7, 8 and 9, 2007, state
Smith was requesting pain medication. [Ex. 500X; 501P; 501Q;
501R; 501S]. "Begging for pain relief." "Not allowing vital
signs to be taken." "No one is doing anything for me here. I
would rather go to seg . . ."[Ex. 500Z]. "Can't I have the
Tylenol #3 to take the edge off the pain?" [Ex. 501P]. "I/M
attempting to stay calm but admits to patience wearing thin.
I/M allowed to vent. Has overall done well to adopt
adaptive resources but finds it is not working to his

benefit and may eventually attempt manipulative behavior to achieve his wanted results." [Ex. 501Q].

103. Smith's weight was recorded at 216 pounds on January 6, 2007 and 214 pounds on January 7, 2007. [Ex. 500Z; 501P].

104. On January 8, 2007, Dr. Blanchette ordered another panorex of Smith's jaw. [Ex. 500H].

105. Smith was examined on January 9 and 11, 2007. [Ex. 500I]. Treatment records from January 9, 2007, state that Smith said, "Do you know that I have the Attorney General working on my diet? I am also to have a bottom bunk. I/M alert and fully oriented in no acute distress . . . I/M [with] many demands wants t.v. . . .  I/M cleared to population [with] mechanically soft diet." [Ex. 500JJ].  Plaintiff was placed on a mechanically soft diet. [Ex. 500KK; 501T].

106. Mechanically soft diet is ordered for Smith on January 9 and is issued statewide on January 12, 2007. [Ex. 501T].

107. Smith was a "no show" for meals on January 18 and a "no show" for breakfast on January 19, 2007. [Ex. 501V].

108. Treatment notes on January 21, 1007, state, "After I/M refused lunch, I/M CNA janitors gave cereal-corn flakes. Sabotages own Rx to suit needs to present.  Pureed diet mech. soft today.  Self-induced but tol. well despite multiple levels of diet required by court order." [Ex. 501W].

109. OMFS at UCONN fit Smith for a new night guard on January 17, 2007.  Smith was prescribed Tylenol #3 prn for pain. [Ex.

500F, 504G].

110. Smith was seen in the mental health unit per his request on January 23, 2007, stating, "'I'm frustrated b/c of the pain in my jaw. Its so bad that its all I can focus on.' Somewhat anxious. Spoke at great length about the pain in his jaw and what staff has and hasn't done for him. He stated that he has a lawsuit pending and because he is not receiving the proper tx it is becoming a MH issue. Thoughts were logical but tangential. Denied any current suicidal ideation. Unhappy [with] medical tx . . . ." [Ex. 501W].

111. Smith was seen in the mental health unit on January 26 and 31, 2007. [Ex. 501Y; 501AA].

112. Smith's weight was recorded at 214 pounds on January 26, 2007. [Ex. 501X].

113. Treatment notes from February 9, 2007, state that Smith received his new night guard. [Ex. 500I]. "I/m takes his old mouth guard also and says he still can use it." Id.

114. Treatment notes from February 22, 2007, state,

> Per i/m says "night guard doesn't have enough separations." Per i/m req. Dr. Toro is contacted and consulted. Dr. Toro recommended to do a bit registration with i/m's comfortable vertical position and add thickness to existing n.g. Lab (Yankee) in contact and asked if they can add some thickness to existing n.g. and they said they could do it. I/m is called down. I/m still wears cotton roll on left side only. N.g. in; says he has pain on [left] side and on [left] side teeth needed to be separated . . . not professionally comfortable doing the procedure, and I am not sure how this is going to help I/M's functional integrity. I/M says he can't chew any food any way. Then

> why a night guard help him functionally?
> Questionable and debatable that I/M has a
> comfortable VDO (when bits down on rolled
> paper) and an uncomfortable VDR (jaw position
> @ rest without teeth in contact ). I/M
> doesn't open mouth. Very difficult to do
> procedure. . . seems like I/M need specialty
> evaluation at UCONN. . . ."

[Ex. 500K].

115. Smith received his new mouth guard on March 6, 2007. [Ex.
500L; 501A]. Treatment notes of March 6 state, "Delivery of
new mouth guard/occlusal appliance done. Very difficult to
insert into I/M's mouth. I/M states it feels O.K. and the
bite relation and jaw separation is comfortable . . . Any
further intervention in regard to this TMJ complaint need to
be addressed by specialist." [Ex. 500L].  On March 7, 2007,
plaintiff was seen complaining that he could not remove the
night guard from his mouth.  Dr. Thomas Thalody, DDS, stated
in his treatment record, "Attempted to remove appliance from
I/M's mouth and I/M doesn't open his mouth at all. I/M bites
down on the appliance strongly and does not open a little
bit.  I was not able to take the appliance out. CHNS is
contacted and informed of the situation. Also, Dr. Toro is
called and informed." [Ex. 500L].

116. Treatment notes from March 7, 2007, state that Smith was
advised to remove his mouth guard during meals. Tapering of
Tylenol #3 is noted. [Ex. 500NN].

117. Dr. Craig McDonald, D.D.S. examined plaintiff on March 12,
2007. Treatment records note that plaintiff had not removed
the night guard since it was placed. Dr. McDonald referred

plaintiff to UCHC Dental for removal or adjustment of the night guard while sedated. "I/M was minimally cooperative and rude." [Ex. 500M; 501A].

118. On March 15, 2007, Dr. Toro administered Valium I.V. to Smith and split and removed the night guard. [Ex. 500M; 501A].

119. Smith was seen by UCONN OMF on March 19, 2007. The OMF Surgeon stated in the treatment notes that, "Pt would benefit from icing q. night b/f bed and has been given stretches for relaxing and opening jaw. Pt. is not a good rehab candidate @ this point until pain issue resolved." [Ex. 501O].

120. Smith refused breakfast and supper on March 21, 2007. [Ex. 501CC]. The clinical record states in part, "Witnessed I/M being very rude/defiant/loud and obstinate [with] both nursing and custody staff during previous shift. I/M stated, "I want some fucking pain medicine, you've not done nothing for me . . . ." The writer observed that Smith's was yelling and that his mouth was open approximately one half inch wide. [Ex. 501DD].

121. On March 26, 2007, plaintiff was called to the medical unit, by Dr. Thalody, to receive another night guard. "I/M says he doesn't want me to touch him and denies to insert the N.G. in his mouth. I/M left the clinic. The N.G. is kept in the clinic." [Ex. 501A].

122. Treatment notes from Dr. Philip McGeoghan, Jr. D.D.S., on

April 4, 2007, state, "followup I/M request. . . I/M asked to place N.G. himself so that he could feel the ability to place and remove N.G. on his own. Capt Patz and Officer Hutchinson were both present. N.G. was completely in place and he was able to remove it on his own. He left saying that he was happy [with] it. I also explained that he could adjust the opening by using gauze to which he agreed." [Ex. 500N].

123. A therapeutic diet request dated April 13, 2007, was submitted for a pureed diet stating "same diet as before per court order." [Ex. 500OO].

124. Dr. Tuttle's treatment notes from April 18, 19 20, 2007, record the efforts made in the medical unit and the kitchen for plaintiff to receive a pureed diet. "Encouraged Mr. Smith to again explore the mental health services that are offered here. He said he would. Mr. Smith did not appear to be in any discomfort as he ate his lunch (through a straw) and talked for over 30 minutes about his jaw problems." [Ex. 500O].

125. Smith was evaluated as a "high risk for self injury" by mental health staff on April 23, 2007, and was admitted to the mental health unit. [Ex. 501FF]. "Made a noose in seg- thinks CO's are going to kill him so he was going to kill himself 1st. Whiney, tearful, s/p broken jaw which is still wired shut needs all food pureed." [Ex. 501FF].

126. Treatment notes from April 24, 2007, report Smith is very

angry, agitated, calling warden names. "I am going to kill myself, I'm going to leave here in a box." "High risk for self harm." [Ex. 501QQ; 501RR].

127. A hunger strike flow sheet was started on April 26, 2007. [Ex. 501QQ].

128. Treatment notes from April 24, 2007, state, "I/M very vocal wanting to talk about past, present and future. Seems to need to talk about problems to release stress. Understands how poor choices continue to limit good options esp. swearing at warden today. He feels if he gets enough tickets he will get moved due to [increased] level. Gave me piece of plastic this evening which he had to protect himself but since he trusts C/O Rismay and myself so much he made decision to be honest and turn it into me. Object was brought to Capt. Steward. I/M reports he does not wish to hurt himself or anyone else. He wants to finish his five years in peace and go home . . . borderline tend. Monitor carefully." [Ex. 501RR].

129. Treatment notes from April 25, 2007, reflect that Smith stated, "The whole side of my face is burning, can I at least have ice to make pain somewhat bearable till you reach a doctor about my meds.?" "I/M on floor crying, refusing to eat and drink as he reported he was in severe pain and was nauseated . . . at this point I/M was sobbing and I was still attempting to speak with on call M.D. Got order for [illegible] an for I/M to be assessed tomorrow. He was very

grateful and after an hour took more fluids and his dinner at 9PM. Then did mouth care. Apologized for crying and asking for the doctor. Very poor coping skills, monitor . . . ." [Ex. 501TT].

130. Treatment notes from May 3, 2007, from Dr. Linda Reicher, DMD, state plaintiff was seen regarding ongoing TMJ issues, noting limited opening, tender anterior to left ear. "We discussed that dental will not give narcotics for a long term problem. His TMJ issues are beyond our expertise (chronic). [Ex. 500P].

131. Smith was granted leave to attend his father's funeral on May 14, 2007. [Ex. 507H].

132. Smith was cleared for transfer to MacDougall on May 15, 2007. Intake notes record, "inmate very anxious and frustrated-states he has been without meds, med order, pass to come to eat in infirmary given. . . ." [Ex. 500SS].

133. Treatment notes from May 16, 2007, record Smith's weight at 179.5 pounds. Dr. Blanchette attributed the weight loss to situational depression, explaining it is common for a person to lose weight when a loved one dies. [Ex. 500SS].

134. Treatment notes from May 16, 2007, state in part, "Pt. has been sitting comfortably [on] exam table narrating his story without any sign of distress in good voice with change of accent or volume of his voice. All anatomic . . . making speech (bellows, phonators, articulators and resonators) seem to be functioning fine. This is surprising when patient

34

apparently has great deal of [illegible] which would involve muscles (articulators). There is no sign of atrophy of muscles of mastication . . . on lt side while disuse atrophy over several years would have caused some! Exam was impossible. There is some mild tenderness over jaws." [Ex. 500TT].

135. Treatment notes from May 24, 2007, state, "Met with I/M regarding multiple issues [with] HSA Furey. I/M C/O preparation of his food in medical. States his food is not blended properly and the cleanliness of the blender. I/M C/O 'wanted relief.' States he wants to be 'reinstated for pain.' States was on Tylenol #3 prior to leaving MCI and 'all meds were d/c when we went to OCI and the other facility.' States he's taking only Motrin for pain and its starting to upset his stomach. C/O unable to receive his prn medications in timely manner 'it's at medical's leisure.' Per the I/M, states he received his pills on person at the other facility and now his meds ran out days ago. 'All I'm trying to do is compromise until court, I want no problems.'" [Ex. 500UU].

136. Smith's weight was recorded at 182.7 pounds on May 25, 2007, [Ex. 500UU], and 191.5 pounds on July 2, 2007, [Ex. 500VV], and 194 pounds on July 7, 2007. [Ex. 500WW].


Dr. Joann Tuttle

137. Dr. Joann Tuttle is a dentist employed by UCONN Correctional

Managed Health Care to work at the DOC. She is currently assigned to Corrigan but rotates between institutions based on need.

138. Dr. Tuttle testified that she treated Smith for his TMJ problems over the years. She stated that Smith did not get the results he wanted from the arthrocentesis performed in 2004.

139. Dr. Tuttle testified that a normal opening of the mouth is approximately 40 mm. Smith's opening varied from day to day. It could be as little as 6 mm or up to 10 mm.

140. Dr. Tuttle opined that the typical treatment for TMJ is non-steroidal anti-inflammatories, muscle relaxants and a night guard. This is the treatment that was provided to Smith.

141. Dr. Tuttle stated that Smith was referred to OMFS at UCONN to see if there was anything else that could be done for him. She spoke with Dr. Shafer, OMFS at UCONN, one of the oral surgeons who examined Smith. She recalled that Dr. Shafer stated there was no structural damage to the joint and therefore surgery was not indicated. She testified that OMFS at UCONN recommended relaxation exercises and therapy to stretch the facial muscles. She opined that this is a common and normal treatment plan for muscles. It was determined that this is a muscle problem now.

142. Dr. Tuttle testified that, in her opinion, Smith is in pain and has difficulty opening his mouth. She believes that

Smith is invested in convincing his medical providers that he is in pain and he can embellish that pain.

143. Dr. Tuttle testified that the last time she examined Smith, he was still complaining of pain. She stated that Smith received treatment for TMJ but that sometimes the treatment does not work. Dr. Tuttle testified, "sometimes there is nothing that will work and the patient is out of luck." She stated, "I hope that is not the case for Smith but I do not know."

144. Dr. Tuttle testified that in January 2007 Smith was transferred to MacDougall after his night guard broke. She stated they were unable to treat him for pain at the facility.

145. Dr. Tuttle suggested that Smith receive mental health treatment and perhaps an anti-depressant to help him deal with pain.

Dr. Edward Blanchette

146. Defendant Dr. Edward Blanchette is the Clinical Director for the Connecticut DOC. He is responsible for overseeing the clinical care delivered to the prison population by physicians, dentists, nursing staff and other health professionals. He is not responsible for overseeing the provision of mental health treatment.

147. Dr. Blanchette testified that he first became aware of Smith's complaints through Smith's correspondence.

148. The doctor testified that he examined Smith in December

2005, in response to plaintiff's appeal for additional TMJ surgery and pain medication.

149. Dr. Blanchette recalled that he spoke to Smith at length and examined Smith's elocution and movement of his jaw and that this gave the doctor information regarding Smith.  Dr. Blanchette testified that, as soon as he attempted to examine Smith, Smith could not open his mouth.  Even though Smith had spoken previously without difficulty, Smith clenched his teeth and tightened his muscles.  Dr. Blanchette observed a dramatic change in Smith's range of motion.  "I tried to get him to relax his muscles but could not."  Smith was unable to open wider then 1MM on examination. Dr. Blanchette wanted to move Smith's mouth from side to side, to feel for clicks or abnormality in the joint. Smith would not permit the doctor to look inside his mouth. Accordingly, Dr. Blanchette's examination of Smith was limited.

150. Dr. Blanchette recalled that Smith was not specific about what surgical procedure he wanted. However, Smith was convinced that his problem could be fixed by additional surgery.

151. Dr. Blanchette testified that one could speculate that Smith's TMJ problem is based on trauma in the past, head banging as a child, psychiatric hospitalizations, and traumatic altercations with people while incarcerated.  He stated that trauma would explain Smith's findings.

152. Dr. Blanchette stated that his responsibility to oversee treatment of TMJ cases involves evaluating treatment, ordering x-rays, making a referral to a dentist and from there to an oral surgeon, if necessary.

153. Dr. Blanchette testified that he believed Smith has some discomfort from TMJ and arthritic changes in his jaw. However, the doctor stated he lacked objective evidence to judge whether Smith was in pain. Assessment of Smith's pain is problematic as Smith has not been honest or cooperative. Dr. Blanchette stated that when asked to show range of motion, Smith shuts down and is not cooperative. The doctor testified it is hard to evaluate pain when the patient is nonresponsive.

154. Dr. Blanchette testified that, based on his evaluation of Smith, he believed Smith had good range of motion, Smith spoke clearly, "completely normal," such that you would not know he had problems with TMJ. However, as soon as Dr. Blanchette said he wanted to examine Smith, Smith could not open his mouth a millimeter. It was not a cooperative examination.

155. Dr. Blanchette supported sending Smith to a physical therapist at UCONN for evaluation. He testified that Smith has been shown exercises to stretch, use a tongue blade and increase his range of motion. There is currently no plan to meet with a physical therapist.

156. Dr. Blanchette testified that it was not his role to deliver

care to Smith directly. Rather, Dr. Blanchette relied on Dr. Torro, oral surgeons on site and UCONN oral surgeons.

157. A physical therapy plan has been offered to Smith. Dr. Blanchette testified that exercises were shown to Smith on multiple occasions and can be shown to him again. However, it will take Smith's full cooperation for the exercises to be successful. Dr. Blanchette stated that the therapy cannot be evaluated properly unless Smith's feedback is honest and accurate.

158. Dr. Blanchette testified that DOC will continue current treatment for Smith's TMJ. Dr. Blanchette stated that he hoped Smith would consider getting mental health assistance and consider taking Elevil, an anti-depressant that has also been effective for pain control.

159. Dr. Blanchette testified that Smith is in vested in demonstrating he has real pain, absolutely committed, and will not deviate from his symptoms.

160. Dr. Blanchette testified that he transferred Smith to MacDougall in January 2007, when his night guard broke. The doctor stated that he felt that the medical staff at MacDougall could deal with the issue in a reasonable period of time. MacDougall is the DOC's highest level medical care facility.

Kitty Dudley, Correctional Counselor Supervisor

161. Kitty Dudley is employed by the Department of Corrections as a Correctional Counselor Supervisor in the Offender

Classification and Population Management Unit. As a
Correctional Counselor Supervisor, Ms. Dudley oversees the
transfer process for over one hundred twenty (120) inmates
per day.  The purpose of the unit is to assign an inmate to
appropriate housing.  Assignment is based on, among other
things, an inmate's length of sentence, severity of crime,
disciplinary history, security and risk group, medical and
mental health needs, vocational and educational needs and
sex offender status.

162. Ms. Dudley testified that Smith's overall risk level was a 4
out of a possible 5.  She opined that an inmate with a
release date of 2013, like Smith, should have an overall
risk level of 3 or close to 2 at this point in his sentence.

163. Ms. Dudley explained that certain correctional facilities
house certain risk levels. For example, if an inmate is a
level 4, he would be housed at a level 4/5 facility.

164. Form RT60 is a computer printout of Smith's transfer history
since he began to serve his sentence in 1992. [Ex. 507A-C].
On January 3, 2007, Smith was transferred from Corrigan to
McDougall at the request of Dr. Blanchette for medical
reasons. [Ex. 507D].  On January 5, 2007, Smith was
transferred from McDougall to Robinson; "[transfer] reasons
population . . . popmgt reason medical inpatient hold." [Ex.
507E].  On April 13, 2007, Smith was transferred from
McDougall to Corrigan because "I/M sent an inappropriate
letter and card to nursing staff member. Transfer to

alleviate issue." [Ex. 507F]. On April 20, 2007, Smith was transferred from Corrigan to Osborne, "transferred per Dr. Blanchette, I/M has his jaw wired, needs his food blended, per Dir. Levesque in consultation with AAG Ann Lynch and Dr. Blanchette." [Ex. 507G]. On May 15, 2007, Smith was transferred from Osborn to McDougall, "to attend a funeral." [Ex. 507H]. Smith received disciplinary tickets resulting in loss of telephone privileges, punitive segregation and/or confinement to quarters on April 24 (insulting language or behavior), May 5 (flagrant disobedience), May 8 (flagrant disobedience) and June 5, 2007 (threats). [Ex. 507I].

165. Smith's RT60 is a record of his transfers between DOC facilities. The record shows that Smith was transferred on 2/14/92 (Union Ave), 2/18/92 (New Haven CCC), 2/11/93 (MH Whiting), 3/31/93 (Hartford CCC), 4/14/93 (Bridgeport CC), 4/23/93 (Hartford CC), 5/25/93 (New Haven CCC), 6/1/93 (Hartford CCC), 6/22/93 (New Haven CCC), 6/25/92 (Hartford CC), 8/9/93 (New Haven CCC), 8/10/93 (Hartford CCC), 12/20/93 (New Haven CC), 12/21/93 (Hartford CC)C, 3/1/94 (Start Serving Sentence), 3/2/94 (MacDougall/Walker CI), 3/3/94 (New Haven CCC), 3/3/94 (Bridgeport CC), 3/4/94 (New Haven CCC), 3/5/94 (Bridgeport CC), 3/7/94 (New Haven CCCC), 3/7/94 (MacDougall/Walker CI), 3/23/94 (MacDougall/Walker CI), 8/4/95 (Cheshire CC), 4/29/97 (Bridgeport CC), 8/22/97 (New Haven CCC), 8/25/97 (Hartford CCC), 2/18/98 (transfer to Iowa), 6/8/03 (return from Iowa to MacDougall/Walker CI),

5/21/04 (Osborn CI), 9/20/04 (Robinson CI), 9/21/04 (Osborn

CCI), 10/7/04 (Robinson CI), 11/29/05 (Corrigan/Rad CI),

1/4/07 (MacDougall/Walker), 4/13/07 (Corrigan/Rad CC),

4/20/07 (Osborn CCI), 5/15/07 (MacDougall/Walker CI). [Ex.

507A-C].


## Plaintiff's Expert, Dr. Jeffrey S. Berkley, D.D.S.

166. Dr. Jeffrey S. Berkley is an oral and maxillofacial surgeon

("OMFS") who offered expert testimony for plaintiff at

trial.[3]

167. Dr. Berkley's letter to plaintiff's attorney, Katherine

Mohan, dated November 16, 2006, states,

> After review of the extensive file of Edward
> Smith III, I have made several determinations
> as discussed with you on the telephone.
> Certainly, Mr. Smith has numerous documented
> injuries to the head and face.  Most of these
> injuries could cause temporomandibular joint
> symptoms.  Mr. Smith has had treatment that
> included arthrocentesis and an occlusal
> orthotic.  Both of these treatments appear to
> have shown subjective and objective
> improvement in his condition.  Removal of his
> impacted teeth did not appear to worsen or
> benefit his condition.  His clinical record
> does not demonstrate any actual fractures of
> the mandible, although it is noted that a
> Towne's view in 2003 suggested an old left
> fracture of the condyle.  An MRI in 2004 did
> document degenerative joint disease, worse on
> the right despite the patient's symptoms
> being worse on the left. However, there was
> not effusion or disc displacement. Repeat MRI
> in 2005 shows similar findings.

---

[3]Dr. Berkley's testimony was presented by video deposition.
A transcript of Dr. Berkley's testimony was provided to the
Court.

Mr. Smith has demonstrated extensive
subjective complaints of pain which have
manifested in clinical observation of limited
opening and myofacial pain dysfunction. I
would agree with a treatment of Mr. Smith's
symptoms using anti-inflammatory medications
and mouth guard.  Additional therapies could
include physical therapy, muscle relaxants,
and Botox trigger point injections.  I do not
believe that narcotics are an appropriate
therapy for myofacial pain.  However, I am in
agreement with his current surgeons that
surgical temporomandibular joint intervention
is not currently indicated. Mr. Smith would
have to resolve the majority of his muscular
symptoms and still have focal
temporomandibular joint pain to warrant
arthroscopic intervention.  I do not believe
arthroplasty is indicated based on his
clinical history and temporomandibular joint
findings.

[Ex. 1i].

168. In rendering his opinion, Dr. Berkley reviewed Smith's

medical records.  He did not examine Smith or meet with

Smith, or examine Smith's mouth guard. [Berkley Tr. 28-29].

169. Dr. Berkley testified that oral maxillofacial surgery is a

subspecialty of dentistry involving "diseases and injuries

of the maxillofacial structures which is the jaw." [Berkley

Tr. 5]. "Oral and Maxillofacial surgery is everything to do

with basically the head, neck, and jaw structures.  We deal

with tooth problems, infection problems, facial and

reconstructive surgery, cosmetic surgery, TMJ issues, facial

pain issues." [Berkley Tr. 10].

170. Dr. Berkley estimated that he has treated thousands of TMJ

cases in his nearly twenty (20) years of practice.  Dr.

Berkley explained that the temporal mandibular joint, or

TMJ, is "the jaw joint. There is actually two of them, one on either side."  He explained that TMJ is a "garbage term," "encompassing a myriad of different disease entities that effect the joints and the structures around the joints." [Berkley Tr. 12].  The problem with the term "TMJ syndrome," he explained, is "that it doesn't specify what disease entity you're dealing with, and there is everything from plain old aging arthritis, degenerative joint disease to infectious processes like Lyme disease that can attack a join to traumatic injuries and muscular problems. We call myofacial pain dysfunction as where the muscles that move the jaw go into spasm and have pain, and its not even in the joint that's having the disease function.  We call all of that TMJ [syndrome]." [Berkley Tr. 13-14].

171. Dr. Berkley testified that the anatomy of the temporal mandibular joint "consists of a ball and socket.  In between the jaw, which has the ball, and the socket, which is in the skull, is a disc made out of cartilage. The disc is held in place by a ligament behind and a muscle in front, and it moves in conjunction with the jaw.  As the jaw moves, the disc moves with it as a protective function." [Berkley Tr. 12-13].

172. Dr. Berkley estimated that the incidence of TMJ syndrome or symptoms in the general population is from ten (10) to twenty (20) percent. [Berkley Tr. 15].

173. The TMJ "allows your jaw to function, to move your lower jaw

45

. . . against your skull bone so that you can open and close your mouth and chew and talk and swallow." [Berkley Tr. 13].

174. With respect to TMJ syndrome that occurs as a result of trauma, the doctor explained it can occur in several different ways. "[B]leeding within the joint which causes scar tissue to form and a restricted opening. You can get a physical damage to the bone, a fracture, which may or may not heal in the correct position. You can get injury to the ligament behind the disc which stretches or tears and makes the disc-that's what holds the disc in its position so the disc then pops forward and isn't properly protective of the jaw. You can get a shattering of the disc because the jaw's smashed into it and physically destroy the disc." [Berkley Tr. 16].

175. Treatment options for TMJ syndrome caused by trauma include physical therapy and/or surgery. Dr. Berkley testified that physical therapy is "used to help mobilize the joint, and it's used to help calm down the muscles because if the disc itself is injured or the joint itself is injured, it usually causes muscle spasm as a reactive process, or sometimes in TMJ syndrome, you just have the muscle spasm component, and it's used to treat that." [Berkley Tr. 18].

176. Dr. Berkley described there a specialized physical therapy techniques, such as Rocobedo and Travell, "which I think are actively used for mobilization of masticatory muscles, so any physical therapist familiar with those techniques can

use them, but there's simple things like ultrasound, heat, spray and stretch that help to mobilize[] muscles, calm them down." [Berkley Tr. 19].

177. Regarding medications, Dr. Berkley testified that, "[m]uscle relaxants are useful.  I don't like them on a long-term basis because they have side effects and sequela, but I think on a short-term basis they work very well." [Berkley Tr. 19].

178. Regarding the use of mouth guards, Dr. Berkley testified that, "[m]outh guards are used for two purposes.  One is to decompress the jaw joint so that you're not putting physical force directly on the disc, which the body has some reparative capabilities, and certainly if you give it the chance to repair, just as if you put a cast or a splint on the leg, a lot of times it will repair itself.  The other thing the disc-it does is it lets the disc have some room, some spacing, so that it can try to come back to place because those posterior fibers are elastic and they tend to want to pull it back if it's been shoved forward, and the third thing that it does, I think very importantly, is it takes the bite out of play so that people that have a bad bite or tend to grind their teeth, they can't put the physical force on, and the bite becomes irrelevant because what you try to do is make the mouth guard hit evenly, and so it serves a protective function also.  Those same types of mouth guards are also used to protect teeth on people who

grind their teeth." [Berkley Tr. 19-20].

179. Dr. Berkley stated that Smith's medical records revealed
     that Smith had sustained "multiple traumas to the head and
     face over a period of many years."  "Initially . . . he had
     an automobile accident predating his incarceration.  He had
     multiple attacks on him while he was incarcerated. He had
     been in the medical facilities just, I don't know, three,
     four, five, six times at least that I saw with blows to his
     face, contusions, none of which resulted in a fracture that
     I could see in the record, but still significant facial
     injuries." [Berkley Tr. 22-23].

180.  Dr. Berkley noted that, Smith first presented complaints of
     jaw pain in 1992. The doctor noted that there was subsequent
     trauma to Smith's jaw for which he received palliative care
     and pain medication.  Dr. Berkley noted that Smith received
     two arthrocentesis. The first reference to Smith having TMJ
     syndrome is contained in the Iowa medical records.  He noted
     that the medical records state that Smith also received a
     soft diet, mouth guard, physical therapy, pain medication
     and anti-inflammatories. [Berkley Tr. 25-26].

181. Dr. Berkley testified that, the records "specifically stated
     that [Smith] improved on physical therapy and his mouth
     guard." Smith also stated that he got relief after the Iowa
     arthrocentesis. [Berkley Tr. 27],

182. Dr. Berkley could not recall how long Smith received
     physical therapy, but recalled it was intermittent. [Berkley

Tr. 27].

183. Dr. Berkley opined that, "from the records, because I have never examined this man, but the records indicate that he has TMJ syndrome based on the fact that two respected programs, the Iowa program and the UCONN program, specifically treated him for that and felt that he had it. That was their diagnosis. I have no reason to doubt their diagnosis." [Berkley Tr. 28-29].

184. Dr. Berkley testified that, "Mr. Smith throughout the record makes complaints of pain and dysfunction of varying degrees dating all the way back to '90-throughout the record, it kind of comes and goes depending on some of his therapies, but he's had consistent complaints of that in addition to headaches-and mainly headaches, pain, dysfunction." [Berkley Tr. 29].

185. Dr. Berkley testified that, "Pretty much everybody in the record was consistent that [Smith's] pain seemed to be muscular, and most-virtually all the providers did not come up with a whole lot of specific focal joint pain. They seemed to be mainly muscular symptoms, and the MRI findings were consistent with that also. They did not find a displaced disc. They did not find specific disease on the MRI." [Berkley Tr. 33].

186. Dr. Berkley stated that he "would have to find from reviewing the record that Mr. Smith has legitimate pain in his face predominantly muscular in nature, and I would say

that it's legitimate based on the notes that I've seen in
his chart." [Berkley Tr. 33].

187. Dr. Berkley added that Smith received "appropriate
treatment" for muscle spasms (splint therapy and physical
therapy) and that Smith responded to those therapies. The
Doctor testified, "I think from looking at the records that
sometimes he's complaining of severe pain when the record
indicates that maybe that wasn't quite where it should be in
intensity, but the mere fact that he's having pain seems
legitimate, and all of these injuries that he had would
produce consistently the kind of pain that he's complaining
of. He's not complaining of a pain that wouldn't make sense
based on the injuries that he had. So I mean, based on
those, and obviously not examining him personally, I think
the record indicates that some degree of pain and
dysfunction is realistic from his history." [Berkley Tr.
34].

188. Although Dr. Berkley did not examine Smith, the Doctor
concluded that Smith's pain and discomfort is related to TMJ
Syndrome. He testified, "[t]he complaint of pain and
dysfunction seemed to be related to TMJ syndrome not
specifically joint. . . but the muscular aspect of that,
which is myofacial pain dysfunction. The degree of
dysfunction and pain I can't really comment on because
there's a lot of conflicting things in the record . . . ."
[Berkley Tr. 35].

189. When asked to offer an opinion on whether the treatment
     Smith received for pain was adequate, Dr. Berkley answered,
     "yes and no."  "It seems that when [Smith] had physical
     therapy and a mouth guard and he had a consistent
     practitioner, I think it was a woman surgeon, addressing his
     complaint, he seemed to respond quite well to that, and so
     in that respect the answer is yes.  However, there's times,
     I don't know if it was when he was transferring facilities,
     or I'm not sure of the background of it, but there's times
     when he then recurs with pain and doesn't seem to be getting
     the same therapies."  [Berkley Tr. 36].  "There are times in
     the record when I really don't know what therapies he's
     receiving, if he's getting the actual therapy that they're
     writing in the notes.  It doesn't seem like he is, but when
     they're writing that he responded to arthrocentesis or he
     responded to an orthotic, when he's getting that therapy, it
     seems to be working.  Nonsurgically, just conservative
     therapy."  [Berkley Tr. 36-37].

190. With regards to future therapy, Dr. Berkley opined that
     Smith had a negative MRI and responded to conservative
     therapy.  "I don't really see at this point in time that
     [Smith] needs any surgical intervention at all. My opinion
     is that he probably needs conservative therapy in terms of a
     soft diet, not puree, just softer diet, he needs physical
     therapy to calm his symptoms down, and then there will be

period when he has no symptoms at all, he doesn't need continued therapy during that time, but he will have potentially periodic flare-ups then he needs recurrent physical therapy at those times, and he probably needs a mouth guard that is ongoing, so because he seemed to respond to it, and I would say that he should probably be in a mouth guard at least at night indefinitely and during times of flare-ups even potentially 24-hour use . . . ." [Berkley Tr. 37].

191. Dr Berkley recommended a six (6) to eight (8) week course of physical therapy, the method to be determined by the therapist. [Berkley Tr. 38-39]. "When I send people for physical therapy, it's usually six or eight weeks, and that's usually it. They usually calm down by then. If they're not calming down in six or eight weeks, they may not be calming down. It doesn't go on forever, but usually then they'll calm down, and sometimes you get patients that have flare-ups and they have to go back into therapy." [Berkley Tr. 39]. "I don't keep them on physical therapy forever. At some point you need to find another way to treat them." [Berkley Tr. 40]. "If someone's continually retriggering, there's usually a reason." [Berkley Tr. 40].

192. Dr. Berkley opined that, "By having a consistent practitioner who follows [Smith's] case and can judge whether they feel that the symptoms are legitimate or not and how severe they are and questions the patient as to

what's going on that's causing the retriggering. Sometimes it's trial and error, but there needs to be somebody finding out why symptoms continually retrigger. In his case he's had multiple traumas so it could just be multiple traumas. I don't know." [Berkley Tr. 41].

193. Regarding pain medication, Dr. Berkley opined, "I think nonsteroidal anti-inflammatories are very indicated in any inflammatory condition. . . Advil, Motrin, Nuprin, that type of drug. I absolutely do not agree with narcotics for this type of entity." [Berkley Tr. 41].

194. When asked, "Other than, again, the physical therapy, the mouth guard, and some of the nonsteriodal pain medication, is there anything else that you would recommend to treat Mr. Smith's TMJ syndrome?" Dr. Berkley answered, "I think you just named them all." [Berkley Tr. 41].

195. Dr. Berkley added, "I think in this case specifically having one provider could be a great advantage here because the record seems to indicate that there's some question of the legitimacy of the severity of his symptoms or whether his symptoms are consistent, and when you have one provider following someone, they have a much better handle on the ebbs and flows of someone's symptoms than seeing different people. So there's a great advantage to having the same person see this guy specifically consistently." [Berkley Tr. 42].

196. When asked, "If an individual claimed that they couldn't

open their mouth once a mouth guard was given to them, would that raise any little red flags in your head?" Dr. Berkley responded, "Yes . . . . A mouth guard should not effect whether a person can open their mouth or not unless the mouth guard itself triggered clenching into it causing a pretty severe muscle spasm." Q. "What if the individual said that the mouth guard made them feel better, would you expect that then they would be able to open their mouth?" A. "Yes." [Berkley Tr. 45].

197. Dr. Berkley opined that no surgical intervention was indicated at this time. [Berkley Tr. 50].

198. Dr. Berkley testified that he thought Smith had legitimate pain in the muscles of mastication. [Berkley Tr. 50]. He agreed that there is a large psychosocial component to myofacial pain disorder, and stress is a factor. [Berkley Tr. 50].

199. Dr. Berkley was asked on cross examination to define the condition "hysterical trimis." The doctor testified that it's "when a person's excitable enough that they won't open their jaw but there's not a physical obstruction to them opening." He further explained there is usually no treatment for this condition. "Some people say just sedate the patient and they'll open, other people say just let it pass and not feed into it and it will pass." [Berkley Tr. 51].

200. Dr. Berkley agreed that the treatment for myofacial pain

includes educating the patient on muscle fatigue and spasm as a cause of his pain and dysfunction, treatment with nonsteriodal anti-inflammatory agents, soft diet, mouth guard, and physical therapy. [Berkley Tr. 51-53].

201. Dr. Berkley testified that a referral for psychological counseling may be warranted when a patient's symptoms don't correspond to a physician's observations. [Berkley Tr. 54].

202. When asked, "Have you been able to rule out, Doctor, that Mr. Smith is in need of psychological or psychiatric care for his complaints of jaw pain?" Dr. Berkley responded, "From the record, it's apparent that Mr. Smith is in need of psychological care. Specifically for jaw pain, I question that because he actually said he responded to conservative therapies, which is a legitimate response, so my answer would be no." [Berkley Tr. 55].

203. Dr. Berkley was asked to review Smith's treatment records dated February 22 and March 15, 2007 [Ex. 500K; 500M; 501A].[4] Dr. Berkley testified that,

> It doesn't make sense to me from the
> patient's point of view because if you got
> the mouth guard in, you should be able to get
> it out, and it doesn't require a lot of
> separation of the teeth to be able to remove
> a mouth guard. A couple of millimeters will
> let it pop down and come out of the mouth.
> So saying that you can't get it out once it's

---

[4]The February 22, 2007, treatment note stated, in part, that Smith appeared complaining that his night guard did not have enough separation and that he was wearing a cotton roll on his right side. [Ex. 500K]. On March 15, 2007, Dr. Toro administered Valium I.V. to Smith and split and removed the night guard. [Ex. 500M; 501A].

been in doesn't make a whole lot of sense;
however, you can go into muscle spasm
clenching into a mouth guard, and if you go
into muscle spasm, have a reflex muscle
spasm, you clamp down on that mouth guard,
and you can't open your mouth.

Now, the response to that would be to give
someone a muscle relaxant like they gave this
guy Valium. At that point you should be able
to open your mouth. So the part I don't
understand is they then cut the mouth guard
to get it out of his mouth. So if they gave
him Valium why did they have to cut it out of
his mouth? That doesn't make sense either.

[Berkley Tr. 58].

204. Dr. Berkley added that, "[t]he degree of vertical separation

in a mouth guard is not dictated by the patient, it's

dictated by the doctor. The patient doesn't tell me that it

should be thicker or thinner. Sometimes they'll tell you

it's too thick, that when it's too thick they're in an

increased vertical and their and their muscles actually

increase spasm, and they can tell you that it's too thick.

Nobody's ever going to tell you it's too thin." [Berkley Tr.

60].

205. Dr. Berkley opined that, "the treatment that was

administered to Mr. Smith seem[ed] to be appropriate from

the State." His only concern he had was "the consistency of

that treatment, not the actual treatments." [Berkley Tr. 64-

65]. The Doctor added that the consistency issue was

probably related to the transfer of Smith between different

correctional facilities and because "some practitioner

wasn't performing appropriately." [Berkley Tr. 65]. Dr.

56

Berkley had no idea why the transfers took place and whether or not the transfers were appropriate from a correctional standpoint. [Berkley Tr. 65].

Dr. Albert Toro

206. Dr. Albert Toro is Health Services Coordinator of Dental Services for UCONN Correctional Managed Health Care. He has held that position since 2005.

207. Dr. Toro testified that he first examined Smith in May 2005. Dr. Toro got Smith's history, collected data, and interviewed him. The examination took fifteen (15) minutes to a half hour.

208. Dr. Toro testified that he was contacted by Dr. Tuttle in January 2007, and informed that Smith's mouth guard was broken. Dr. Toro examined Smith at MacDougall to establish a baseline and to arrange for a new mouth guard. Smith was prescribed a muscle relaxant, Flexeril, for ninety (90) days and Tylenol 3 for pain PRN. [Ex. 500Q].

209. Dr. Toro stated that Smith was examined by Dr. Schafer on January 17, 2007, (Ex. 500F), for impressions to be made to fabricate a new mouth guard. Dr. Toro sent Smith to UCONN Health; however, Smith could not open his mouth, requiring sedation to take the impression. [500F].

210. Dr. Toro testified that he personally picked up the impression models and delivered them to Yankee Dental, the fabricator. When the mouth guard was completed, he

delivered it to MacDougall.  He recalled that Smith was very happy with his new mouth guard. [Ex. 500I].

211. Dr. Toro recalled that Smith subsequently complained about the fit of his new mouth guard, claiming that the mouth guard did not separate his teeth enough.  The Doctor disagreed with plaintiff's expert, Dr. Berkley, who opined that the decision to add more separation to a mouth guard is for the dentist and not the patient. Dr. Toro testified that, "it's a give and take;" the doctor must take a patient's well being into consideration to get a good fit and adjustments may need to be made.

212. Dr. Toro asked the dentist to add wax and sent the mouth guard back to the lab.  The doctor recalled that Smith was very happy with the result.  However, Smith then complained that he was unable to remove the mouth guard.  Dr. Toro testified that Dr. Blanchette ordered Valium to be injected intramuscularly to relax Smith's mouth. The dentist was unable to pry out the mouth guard. After a third injection was administered, Dr. Toro used tongue blades and forced Smith's jaw open; he used a dental drill to break the mouth guard in half and removed it. [Ex. 500M].

213. Dr. Toro testified that Valium should have relaxed Smith's muscles to permit him to open his mouth.  However, Valium would have no effect on an intentional bite down.

214. Dr. Toro stated that a second mouth guard, identical to the first, was provided to Smith a couple of days later.  Smith

58

placed the mouth guard on his own and removed it. This is the mouth guard that Smith is currently wearing. [Ex. 500N].

215. Dr. Toro testified that Smith was referred for physical therapy in March 2007. [Ex. 501O].  Treatment records from March 19, 2007, describe the chief complaint as "Unable to open mouth, wears mouth guard constantly, c/o pain all the time. Dr. Toro submits request by OMFS (Shafer), Request PT consult on MS5."  The treatment notes further state, "Pt would benefit from icing q. night b/f bed and has been given stretches for relaxing and opening jaw.  Pt is not a good rehab candidate @ this point until pain issue resolved." [Ex. 501O].

216. Dr. Toro read from the treatment notes written by Dr. Reicher, DMD, dated May 3, 2007, which state in part, "Pt has gauze and Motrin 800 mg (Dr. Tuttle) RX X 30 days. Still in Seg.  Hx OMFS visits and Phys. Therapy.  We discussed that dental will not give narcotics for a long term problem. His TMJ issues are beyond our expertise (chronic).  Next week I will see him to discuss analgesic regime and perhaps order ice packs at bedtime.  Will discuss with Dr. Pillai." [Ex. 500P].

217. Dr. Toro read the follow-up treatment notes written by Dr. Reicher dated May 8, 2007, which state in part, "Patty [RN] says [Smith] is on Tylenol #3 until Court date and says that we can not do ice packs at night." [Ex. 500P

Plaintiff's Inmate Request Forms

218. From June 16, 2003 through December 9, 2005, Smith filed inmate request forms seeking  medical attention and/or evaluation for TMJ surgery [Ex. 2C, 2D, 2F, 2H, 2I, 2J, 2M, 2N, 2O, 2AF, 2AG, 2AI, 2AJ, 2AK, 2AM, 2AW, 2AY, 2BA]; to obtain and/or review his medical records [Ex. 2A, 2B, 2W, 2Z, 2AA, 2AB], pain medication [Ex. 2E, 2G, 2K, 2L, 2P, 2Q, 2R, 2S, 2T, 2U, 2V, 2Y, 2AC, 2AD, 2AE,  2AF, 2AH, 2AJ, 2AM, 2AN, 2AO, 2AP, 2AQ, 2AR, 2AS, 2AT, 2AU, 2AV, 2AW]; and a soft food diet [Ex. 2AH, 2AZ, 2BB,2BD].

DISCUSSION

Plaintiff alleges that defendants violated his constitutional rights under the Eighth Amendment to the United States Constitution.  The question before the Court is whether plaintiff has sustained his burden of proof on these claims. The Court concludes that he has not and finds in favor of the defendants on all counts.

B.    Eighth Amendment

1.    Deliberate Indifference to Serious Medical Need

The Court finds no credible evidence of deliberate indifference to the serious medical or mental health needs of the plaintiff.

The defendants argue that there is no factual support for the plaintiff's claim of deliberate indifference to a serious

medical need. Deliberate indifference by prison officials to a prisoner's serious medical need constitutes cruel and unusual punishment in violation of the Eighth Amendment. See Estelle v. Gamble, 429 U.S. 97, 104 (1976). To prevail on such a claim, however, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Id. at 106. A prisoner must show intent to either deny or unreasonably delay access to needed medical care or the wanton infliction of unnecessary pain by prison personnel. See Id. at 104-05. Mere negligence will not support a §1983 claim; the conduct complained of must "shock the conscience" or constitute a "barbarous act." McCloud v. Delaney, 677 F. Supp. 230, 232 (S.D.N.Y. 1988) (citing United States ex rel. Hyde v. McGinnis, 429 F.2d 864 (2d Cir. 1970)).

"Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." Estelle, 429 U.S. at 106. A treating physician will be liable under the Eighth Amendment only if his conduct is "repugnant to the conscience of mankind." Tomarkin v. Ward, 534 F. Supp. 1224, 1230 (D.C.N.Y. 1982) (quoting Estelle, 429 U.S. at 105-06). Inmates do not have a constitutional right to the treatment of their choice. See Dean v. Coughlin, 804 F.2d 207, 215 (2d Cir. 1986). Thus, the mere disagreement with prison officials about what constitutes appropriate care does not state a claim cognizable under the Eighth Amendment. See Ross v. Kelly, 784 F. Supp. 35, 44 (W.D.N.Y.), aff'd, 970 F.2d 896 (2d Cir.), cert. denied, 506

U.S. 1040 (1992) (citation omitted).

There are both subjective and objective components to the deliberate indifference standard. See Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994), cert. denied sub nom., Foote v. Hathaway, 513 U.S. 1154 (1995). The alleged deprivation must be "sufficiently serious" in objective terms. Wilson v. Seiter, 501 U.S. 294, 298 (1991).

> A medical condition is deemed "serious" if it is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention . . . . The seriousness of an inmate's medical need may also be determined by reference to the effect of denying the particular treatment." Hunt v. Uphoff, 199 F.3d 1220 (10th Cir. 1999). Thus, if "unnecessary and wanton infliction of pain' results, or where the denial of treatment causes an inmate to suffer a life-long handicap or permanent loss, the medical need may be considered serious. Harrison v. Barkley, 219 F.3d 132, 136 (2d Cir. 2000). The term "sufficiently serious" has also been described as "a condition of urgency, one that may produce death, degeneration, or extreme pain." Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996); Bonner v. New York City Police Dep't, No. Civ.A. 99-3207, 2000 WL 1171150 (S.D.N.Y. Aug.17, 2000) (fact that plaintiff suffered from discomfort and one of his fingers did not close did not constitute serious medical need); Grant v. Burroughs, No. Civ.A. 96-2753, 2000 WL 1277592 (S.D.N.Y. Sept.8, 2000) (even assuming plaintiff was in pain for two months, plaintiff's pain was not so severe as to constitute a serious medical condition); Davidson v. Harris, 960 F. Supp. 644 (W.D.N.Y. 1997) (even though plaintiff was recovering from surgery for multiple stab wounds, and allegedly was denied oxygen and pain killers for six to eight hours, there was no showing of serious medical condition).

Sonds v. St. Barnabas Hosp. Correctional Health Services, 151 F. Supp. 2d 303, 310 (S.D.N.Y. 2001); see Nance v. Kelly, 912 F.2d 605, 607 (2d Cir. 1990) (Pratt, J., dissenting) (the"'serious medical need' requirement contemplates a condition of urgency, one that may produce death, degeneration, or extreme pain"); see, e.g., Neitzke v. Williams, 490 U.S. at 319 (1989) (brain tumor); Hathaway v. Coughlin, 841 F.2d 48 (2d Cir. 1988) (broken pins in hip); Williams v. Vincent, 508 F.2d 541 (2d Cir. 1974) (doctor discarded inmate's ear and stitched stump rather than attempting to reattach ear); Martinez v. Mancusi, 443 F.2d 921 (2d Cir. 1970) (prison doctor refused to follow surgeon's instructions and refused to give prescribed painkiller to inmate), cert. denied, 401 U.S. 983 (1971).

Not all medical conditions, however, satisfy this component of the standard. See, e.g., Jones v. Lewis, 874 F.2d 1125 (6th Cir. 1989) (mild concussion and broken jaw), cert. denied, 506 U.S. 841 (1992); Hutchinson v. United States, 838 F.2d 390 (9th Cir. 1988) (kidney stone); Hanton v. Grotta, No. 3:97CV93, 2000 WL 303428 (D. Conn. Feb. 11, 2000) (back and neck pain, denial of bottom bunk); Malsh v. Austin, 901 F. Supp. 757 (S.D.N.Y. 1995) (delay in providing routine dental treatment); Glasper v. Wilson, 559 F. Supp. 13 (W.D.N.Y. 1982) ("bowel problems"). The Second Circuit has identified several factors that are highly relevant to the inquiry into the seriousness of a medical condition: "[t]he existence of an injury that a reasonable doctor

or patient would find important and worthy of comment or
treatment; the presence of a medical condition that significantly
affects an individual's daily activities; or the existence of
chronic and substantial pain." Chance v. Armstrong, 143 F.3d
698, 702 (2d Cir. 1998) (citation omitted). In addition, where
the denial of treatment causes plaintiff to suffer a permanent
loss or life-long handicap, the medical need is considered
serious. See Harrison v. Barkley, 219 F.3d 132, 136 (2d Cir.
2000).

In addition to demonstrating a serious medical need to
satisfy the objective component of the deliberate indifference
standard, an inmate also must present evidence that,
subjectively, the charged prison official acted with "a
sufficiently culpable state of mind." Hathaway, 37 F.3d at 66
(citing Wilson, 501 U.S. at 298). "[A] prison official does not
act in a deliberately indifferent manner unless that official
'knows of and disregards an excessive risk to inmate health or
safety; the official must both be aware of facts from which the
inference could be drawn that a substantial risk of serious harm
exists, and he must also draw the inference.' " Id. (quoting
Farmer v. Brennan, 511 U.S. 825, 837 (1994)); Cuoco v. Moritsugu,
222 F.3d 99, 107 (2d Cir. 2000)).

> A difference of opinion between a prisoner
> and prison officials regarding medical
> treatment does not, as a matter of law,
> constitute deliberate indifference. Chance
> v. Armstrong, 143 F.3d 698, 703 (2d Cir.
> 1998); United States ex rel. Hyde v.
> McGinnis, 429 F.2d 864, 867 (2d Cir. 1970)
> (citing Coppinger v. Townsend, 398 F.2d 392,

394 (10th Cir. 1968));  McCloud v. Delaney,
677 F. Supp. 230, 232 (S.D.N.Y. 1988)
("[t]here is no right to the medical
treatment of one's choice...").  Nor does the
fact that an inmate might prefer an
alternative treatment, or feels that he did
not get the level of medical attention he
preferred.  Dean v. Coughlin, 804 F.2d 207,
215 (2d Cir. 1986).  As long as the medical
care is adequate, there is no Eighth
Amendment violation. Wandell v. Koenigsmann,
No. Civ.A. 99-8652, 2000 WL 1036030, at *3
(S.D.N.Y. July 27, 2000).

Indeed, prison officials and medical officers
have wide discretion in treating prisoners,
and  Section 1983 is not designed to permit
federal courts to interfere in the ordinary
medical practices of state prisons.  Church
v. Hegstrom, 416 F.2d 449, 450-451 (2d Cir.
1969).  Federal courts are generally hesitant
to second guess medical judgments and to
constitutionalize claims which sound in state
tort law.  Dean v. Coughlin, 804 F.2d 207,
215 (2d Cir. 1986) ("The Constitution does
not command that inmates be given medical
attention that judges would wish to have for
themselves.")  So strong is this view that
determinations of medical providers
concerning the care and safety of patients
are given a "presumption of correctness."
Perez v. The County of Westchester, 83 F.
Supp.2d 435, 440 (S.D.N.Y. 2000) (citing
Kulak v. City of New York, 88 F.3d 63, 77 (2d
Cir. 1996)).

Sonds, 151 F. Supp. 2d at 311 (S.D.N.Y. 2001).

Plaintiff claims that his Eighth Amendment rights were

violated by defendants' failure to provide him with pain

management, a comprehensive physical therapy plan, consistent

medical providers and/or continuity of care. By action or

inaction, plaintiff contends defendants were deliberately

indifferent to plaintiff's pain and suffering. Plaintiff asks, by

way of injunctive relief, that the Court order a comprehensive

physical therapy plan.

There is no objective medical evidence that the medical care provided to plaintiff for his TMJ condition rose to the level of deliberate indifference. The record clearly demonstrates that plaintiff was not denied medical attention for his complaints. Rather, the medical records and evidence demonstrate that plaintiff received adequate medical attention for his TMJ condition and any perceived inadequacy of his medical care did not rise to a level of "sufficiently serious."

Plaintiff clearly believes that his medical care has been inadequate because it has not cured his condition or alleviated his pain and discomfort. However, "differences of opinion between a prisoner and prison officials concerning the appropriate course of treatment for the prisoner's medical condition do not rise to the level of an Eighth Amendment violation." Edmonds, 2002 WL 368446, at 8 (citing Chance v. Armstrong 143 F.3d 698, 703 (2d Cir. 1998); see Estelle, 429 U.S. at 107 (the "question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice, . . ."). It is undisputed that Smith's dental records contain a diagnosis of TMJ syndrome and the defendants do not dispute that Smith's TMJ condition causes him pain despite the treatments that have been offered. The "'serious medical need' requirement contemplates a condition

66

of urgency, one that may produce death, degeneration, or extreme pain." See Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996) (citing Nance v. Kelly, 912 F.2d 605, 607 (2d Cir. 1990) (Pratt, J., dissenting)). If true, plaintiff's complaints of "extreme pain" would seem to qualify his TMJ condition as a "serious medical need." The Court will presume the seriousness of the condition but plaintiff has failed to establish the other elements of deliberate indifference.

In addition to demonstrating a serious medical need to satisfy the objective element component of the deliberate indifference standard, Smith must also present evidence that, subjectively, the charged prison official acted with "a sufficiently culpable state of mind." Hathaway, 37 F.3d at 66. "[P]rison officials are not liable 'if they responded reasonably to a known risk, even if the harm ultimately was not averted.'" Edmonds v. Greiner, No. 99 CIV. 1681(KNF), 2002 WL 368446, *8

The record does not support plaintiff's claim that Dr. Blanchette, who is specifically named as a defendant, or plaintiff's other medical/dental providers were indifferent, let alone deliberately indifferent, to his serious dental need. Plaintiff consistently received a soft diet and/or blended diet. Plaintiff's insistence that he could only tolerate a pureed diet was not supported by his expert witness or the medical evidence. The Court notes that Mr. Smith's testimony on this point was not credible in light of his commissary list from 2004 to 2005, which included hard and difficult items to chew. [Ex. 305]. Similarly,

67

there is no evidence that defendants were deliberately indifferent to plaintiff's pain. The record contains no medical opinion, including one from plaintiff's expert Dr. Berkley, that long term treatment of Mr. Smith's TMJ pain should include narcotics. Rather, the medical defendants and Dr. Berkley agreed that the appropriate course for treating muscular jaw pain was with nonsteroidal anti-inflammatories and muscle relaxants, not narcotics.[5] [Ex. 1i; Ex 501D; IF; 500P]. After two arthrocenteses, one in 1999 and 2004, plaintiff's treating OMFS and plaintiff's expert both agreed that no further surgical intervention was indicated. [Berkley Tr. 50, Ex. 1i; Stip. ¶39].

In addition, the medical defendants agree that physical therapy designed to increase plaintiff's range of motion and to relieve muscle pain is recommended. Nevertheless, the medical evidence does not support a finding that defendants violated plaintiff's Eighth Amendment rights in this regard. Defendants provided evidence to show that they attempted to provide physical therapy for TMJ, but that Smith often refused treatment. A review of the treatment records establishes that Smith was uncooperative in implementing his therapy, often demanding narcotics before he would participate. A second arthrocentesis

---

[5]Indeed, Dr. Hanny, a facility physician, decreased Smith's Flexeril dosage on November 14, 2005. Dr. Hanny's treatment notes state, "[a]s I explained to him why I have to reduce his medication (i.e. liver damage) he became angry and started shouting at me that I'm taking away his pain medications and I'm not replacing it with anything-'hell [with] my liver I want to have my pain medications.'" [Ex. 501E]. Dr. Berkley testified that muscle relaxants were useful but did not recommend their use on a long-term basis because of side effects. [Berkley Tr. 19].

was performed in Connecticut on October 21, 2004. On November 16, 2004, Dr. Hatzigiannis, OMFS, recommended mouth opening exercises for thirty (30) minutes daily for eight (8) weeks, a splint, a non-chewing diet and Naprosyn for eight weeks. [Ex. 500D]. Smith performed his therapy as instructed on November 17, 2004. [Ex. 1C]. On November 18, 2004, Smith's request for pain meds was denied and he was told by Dr. Giarratara that Tylenol #3 would not be renewed. [Ex. IC]. Smith refused to perform therapy on November 18 or 23 and December 16, 2004. [Ex. 1C, 1D, On November 24, 2004, Smith performed his therapy for fifteen (15) minutes instead of the recommended thirty (30) minutes. Smith was provided with Tylenol #3 and left the unit. [Ex. ID]. Smith was a "no show" for physical therapy on November 29 and December 15, 2004. [Ex. ID; IE]. On December 16, 2004, treatment notes state that Smith was frustrated with therapy and not progressing and that Dr. Blanchette did not renew Smith's Tylenol #3 prescription. Muscle relaxant and nonsteroidal anti-inflammatory drugs were continued. [Ex. 1E, Stip. ¶ 31, Ex. 505B]. On December 17, 2004, the treatment notes state that Smith was writing a grievance because he needed Tylenol #3. "Dr. Blanchette called UCONN (OMF), Tylenol #3 'not warranted' (denied)-Tylenol #3 not renewed." [Ex. IF]. Smith was a "no show" for therapy on December 17, 2004. [Ex. 1F]. On December 27, 2004, Smith was seen at UCONN by Dr. Mayers, OMFS. Dr. Mayers prescribed Tylenol #3 as needed for one week. [Stip. ¶32]. Plaintiff was informed that his emergency grievance for pain medication was denied on January 11,

2005, "[a]t which time I/M became irate and began yelling at which time I/M was asked to leave unit." [Ex. 1G]. Smith was a "no show" for AM meds on January 12, 2005. [Ex. 1G.]. Dr. Pillai met with Smith on May 12, 2005.  The doctor noted that the OMFS recommended jaw exercises to open Smith's mouth, pain management, but no further surgical intervention. [Stip. ¶36].  "Plan: I did discuss[] with I/M the concerns of long term narcotic dependence issues especially in light of discrepancies noted between subjective and objective findings.  I/M gets immediately angered yelling and [was] escorted out of office by officer." [Ex. 501D]. Plaintiff refused to perform mouth exercises on June 3, 7 and 8, 2005. [Ex. 505A]. Smith was a "no show" for mouth exercises on May 19 and June 9, 2005. [Ex. 501D; 505A].  On September 22, 2005, M. Castro, Medical Program Manager, wrote to Smith,  "[t]he best treatment for this [condition] is compliance with self-care measures to prevent or decrease jaw muscle tightness or overuse. Continued use of your splint and adherence to a soft diet will help your jaw muscles relax and rest. Information concerning helpful suggestions and exercises is enclosed." [Ex. 505C & D]. The Court notes that plaintiff's expert recommended a six to eight week course of physical therapy, stating, "[i]f they are not calming down in six to eight weeks, they may not be calming down.  It doesn't go on forever, but usually then they'll calm down, and sometimes you get patients that have flare-ups and they have to go back into therapy." [Berkley Tr. 38-39].  "I don't keep them on therapy forever.  At some point you need to find

another way to treat them."  Id. at 40.

It is clear from other cases that have considered inmate complaints of denial or delay of medical treatment that plaintiff's complaints do not constitute a "serious medical need." Estelle, 429 U.S. at 106; see Nance, 912 F.2d at 607 (Pratt, J., dissenting) (discussing cases which have met the "serious medical needs" requirement).  Plaintiff's disagreement with his medical treatment, on this record, does not constitute deliberate indifference to a serious medical need and does not constitute cruel and unusual punishment.

Finally, the Court finds that Smith failed to meet his burden of producing evidence demonstrating that defendants were deliberately indifferent to his serious dental need by delaying and denying treatment.[6]  Both defendants and plaintiff's expert agree that treatment of plaintiff's TMJ condition through further surgery, narcotics, long term use of muscle relaxants or a pureed diet is not medically warranted.  At most, Smith has demonstrated a difference of opinion regarding physical therapy treatment, and that does not rise to the level of an Eighth Amendment violation..

Mere negligence will not support a section 1983 claim; "the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law." Smith

---

[6]Plaintiff's denial of treatment claim includes failure to provide ice packs, denial and/or delay in receiving pain medication, delay in receiving a second arthrocentesis, other physical therapy approaches such as ultrasound waves and Botox injections

v. Carpenter, 316 F.3d 178, 184 (2d Cir. 2003). Thus, "not every lapse in prison medical care will rise to the level of a constitutional violation," id; rather, the conduct complained of must "shock the conscience" or constitute a "barbarous act." McCloud v. Delaney, 677 F. Supp. 230, 232 (S.D.N.Y. 1988) (citing United States ex rel. Hyde v. McGinnis, 429 F.2d 864 (2d Cir. 1970)). "It must be remembered that the State is not constitutionally obligated, much as it may be desired by inmates, to construct a perfect plan for dental care that exceeds what the average reasonable person would expect or avail herself of in life outside the prison walls." Dean v. Coughlin, 804 F.2d 207, 215 (2d Cir. 1986). Thus, mere disagreement with prison officials about what constitutes appropriate care can not serve as the basis for a claim cognizable under the Eighth Amendment. See Ross v. Kelly, 784 F. Supp. 35, 44 (W.D.N.Y. 1992), aff'd, 970 F.2d 896 (2d Cir. 1992).

Moreover, both plaintiff's expert and the defendant treatment providers recognize that some conditions fail to respond to treatment, however appropriate. Chronic pain is a fact of life for nonprisoners as well as some prisoners, and the inability to cure it does not necessarily rise to the level of malpractice, let alone a constitutional violation.

The Court finds in favor of defendants on plaintiff's Eighth Amendment claims that defendants were deliberately indifferent to plaintiff's serious medical needs.

CONCLUSION

Based on the foregoing, the Court enters judgment for defendants on all counts.

This is not a recommended ruling.  The parties consented to proceed before a United States Magistrate Judge [Doc. #47] on July 31, 2006, with appeal to the Court of Appeals.

ENTERED at Bridgeport this 28th day of March 2008.


/s/_____
HOLLY B. FITZSIMMONS
UNITED STATES MAGISTRATE JUDGE